IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KIRK MICHAEL FIELDS,

      *Plaintiff*,

v.

GWINNETT COUNTY
POLICE DEPARTMENT, *et al.*,

      *Defendants*.

CIVIL ACTION FILE
NO. 1:22-CV-3684-LMM-JKL

**PLAINTIFF'S RESPONSE TO MOTIONS TO DISMISS BY
DEFENDANTS HOWSE [Dkt. 80] AND D'ALLAIRD & LEWIS [Dkt. 89]**

# TABLE OF CONTENTS [1]

**I.  The Court Should Deny the Rule 12(b)(5) Motion for Improper Service** ........................3

   A.  The Affidavits of Service Satisfy Mr. Fields's Prima Facie Burden ...................... 4

   B.  Defendants Fail to Provide "Strong and Convincing" Evidence that Service was Improper ................................................... 5

   C.  Even if Defendants Could Meet Their Burden, the Remedy Would be to Extend the Service Deadline ......................................... 7

**II.  The Court Should Deny the Rule 12(b)(6) Motion for Failure to State a Claim** ........10

   A.  *Heck* Does Not Apply (*Counts V and VI*) ................................................. 10

      1.  Mr. Fields is not in Custody for the Same Conviction............................10

      2.  Defendants' Liability for False Arrest Does Not "Necessarily Logically Contradict" the Facts of Mr. Fields's Convictions .................11

      3.  Defendants' Liability for Excessive Force Does Not "Necessarily Logically Contradict" the Facts of Mr. Fields's Convictions .................11

   B.  The Officers Are Not Entitled to Qualified Immunity ........................................... 13

      1.  Defendants Violated Clearly Established Law by Arresting Mr. Fields Without Arguable Probable Cause (*Count V*) ..............................14

      2.  Defendants Violated Clearly Established Law by Using Excessive Force when Arresting Mr. Fields (*Count VI*) ...............................17

      3.  Defendants Violated Clearly Established Law by Failing to Secure Mr. Fields's Property Upon Arrest (*Count VII*) ........................................24

   C.  The Officers Are Not Entitled to Official Immunity (*Count VIII*) ....................... 26

---

[1] Page numbers begin at 3 to avoid confusion with the ECF numbering.

## ARGUMENT [2]

This Court has already twice ruled that Mr. Fields stated cognizable claims related to his 2022 arrest. [Dkts. 5, 8; Dkts. 23, 27]. It should do so again. Defendants repeat many of the same arguments under Rule 12(b)(6) for dismissing the claims related to that incident (Counts V–VIII). They also argue that service was improper. But none of those arguments prevent these claims from moving forward. The Court should deny Defendants' Motions. [Dkts. 80, 89].[3]

## I.  The Court Should Deny the Rule 12(b)(5) Motion for Improper Service [4]

As Defendants admit, under Rule 12(b)(5)'s burden-shifting framework, when the plaintiff has provided prima facie evidence supporting service, "the burden shifts back to the defendant to provide *strong and convincing evidence* to overcome the presumption of valid service." *Loughlin v. Amerisave Mortg. Corp.*, No.

---

[2] Unless otherwise noted, all internal citations and alterations are omitted and all emphasis is added.

[3] Mr. Fields will separately respond to the Motion related to the 2021 incidents and the defense raised by the Gwinnett County Police Department. [Dkt. 87].

[4] As an initial matter, Defendants' motion to dismiss for failure to make proper service cites both Rule 12(b)(2) and Rule 12(b)(5), but such motions are properly brought under Rule 12(b)(5). *See, e.g., Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs.*, 553 F.3d 1351, 1360 (11th Cir. 2008) ("Lack of personal jurisdiction, Rule 12(b)(2), and insufficiency of service of process, Rule 12(b)(5), are listed as separate defenses under Rule 12. Fed.R.Civ.P. 12(b).") Moreover, though Defendant Howse raised improper service in his Answer [Dkt 79 at 2], only Defendants D'Allaird and Lewis moved to dismiss on this basis under Rule 12(b)(5). [Dkt. 89]. Thus, this section of the Response is directed to that Motion.

1:14-CV-3497-LMM-LTW, 2015 WL 13709947, at *3 (N.D. Ga. July 27, 2015), *R&R adopted,* 2015 WL 13709966 (N.D. Ga. Aug. 24, 2015); [cited in Dkt. 89 at 3].

Yet Defendants misstate that burden and the evidentiary record by claiming that Mr. Fields "cannot present prima facie proof" of valid service. [Dkt. 89 at 4]. That's wrong as a matter of fact. Mr. Fields has already presented such proof. The argument is also wrong on the law. It is Defendants—who provided only a conclusory affidavit with essentially no facts specific to this case—who fail to meet their burden. Even if they could, the proper remedy would be to extend the service deadline, not dismiss the case. The Court should deny Defendants' Motion.

### A. The Affidavits of Service Satisfy Mr. Fields's Prima Facie Burden

Contrary to Defendants' suggestion, Mr. Fields already provided the prima facie evidence required by filing the affidavits of service. Rule 4(e)(2)(C) allows service on an individual by "delivering a copy [of the summons and complaint] to an agent authorized by appointment or by law to receive service of process." The affidavits, completed by the professional process servers engaged to effectuate service, state that "Service [was] accepted by Cpl. R.M Broccoli on behalf of" the Defendants. [*See, e.g.,* Dkt 78-2]. The affidavits further state that the officers "do not accept" service at their ordinary Headquarters location and that the servers "have to go" to serve Corporal Broccoli. [*Id.*] That satisfies Mr. Fields's burden and lets

the Court presume valid service. The burden thus shifts to Defendants to provide "strong and convincing" evidence to rebut that presumption.

## B. Defendants Fail to Provide "Strong and Convincing" Evidence that Service was Improper

Defendants cannot satisfy their burden. Their challenge to Plaintiffs' evidence depends on a cursory affidavit from Corporal Broccoli. But Corporal Broccoli *nowhere denies that he in fact accepted service on behalf of the Defendants* as both process servers averred. That basic failure to address the key point means that, even standing alone, Broccoli's affidavit could not amount to the "strong and convincing" evidence needed for Defendants to prevail.

Rather than deny that he in fact accepted service, Broccoli makes only the general assertion that "I do not accept . . . service of summonses and complaints" and denies that he has *authority* to accept service [Dkt. 89-1 ¶ 4]. Yet even discussing his authority, Broccoli equivocates. He states that while he is authorized to "distribut[e] subpoenas" on behalf of officers, he is *not* authorized to accept summonses. [Dkt. 89-1 ¶¶ 3–4]. Accepting and distributing subpoenas—especially for those officers' "court attendance"—presupposes that Broccoli has sufficient authorization to subject the officers to the personal jurisdiction of the court. After all, courts "must have personal jurisdiction over a nonparty to compel compliance with" a Rule 45 subpoena," *Heissenberg v. Doe*, No. 21-80716-CIV, 2021 WL 2621100, at *2 (S.D. Fla. June 24, 2021), just like they do over a defendant, *see, e.g.,*

*Winston v. Walsh,* 829 F. App'x 448, 450 (11th Cir. 2020) ("federal courts must have personal jurisdiction over defendants.") The distinction Broccoli's affidavit purports to draw, therefore, undermines rather than supports its conclusion.

Other evidence further undermines Broccoli's affidavit and confirms that service was proper. Beyond the original affidavits of service, the two third-party process servers—who were "surprised" by Broccoli's belated denial of authority—have now sworn affidavits directly contradicting his bare assertions. [*See* Affidavit of Rachel Lindley, attached as **Exhibit 1,** ¶¶ 13–15; Affidavit of Ericka McMillon, attached as **Exhibit 2**, ¶¶ 11–12].

In particular, the process servers separately and independently state facts corroborating one another's account but contradicting Broccoli's: (1) when seeking the individual officers to serve, they were specifically directed by a Gwinnett County employee to serve the documents on Corporal Broccoli; (2) Corporal Broccoli reviewed the documents at issue and accepted service of them; and (3) Corporal Broccoli (or another liaison officer in the same office) has accepted service of process on behalf of officers in other cases. [*See* Ex. 1 ¶¶ 4–12; Ex. 2 ¶¶ 4–10.]

Records from other cases further support these process servers' testimony. For example, in *Campbell v. Krizbai,* No. 1:21-CV-2076-ELR-JEM, the Court ordered the U.S. Marshalls to complete service on the Gwinnett County Police Officer Defendants. *See id.*; 2023 WL 9420485, at *2 (N.D. Ga. Aug. 4, 2023) (summarizing

prior order). The Marshalls accomplished service on the officers in their "Individual Capacity" by serving a "CPL Everett Court Liaison" at "75 Langley Dr, Lawrenceville GA." [*See* No. 1:21-CV-2076, Dkt. 26, attached here as **Exhibit 3**; No. 1:21-CV-2076, Dkt. 38, attached as **Exhibit 4**].

Like Everett, Broccoli is a Corporal, has served as a liaison for accepting service in other cases, and was identified by Department staff as serving in that role, and was served at 75 Langley Drive in Lawrenceville. Yet it does not appear that the defendant officers in *Campbell*—who were defended by the county just as those here—challenged or contested service.

In sum, not only do Defendants fail to present "clear and strong evidence" to support their Motion, the evidence from this case and others reaffirms that service on Corporal Broccoli was proper and sufficient to bring the Defendants under this Court's jurisdiction.

### C. Even if Defendants Could Meet Their Burden, the Remedy Would be to Extend the Service Deadline

Defendants' Motion should be denied. But were the Court to credit Corporal Broccoli's affidavit, it still should not dismiss the case. Instead, the Court should extend the service deadline. It can do so for any one of (at least) three reasons.

*First*, the Court should extend because the Gwinnett officers "conceal[ed] a defect in attempted service." *Horenkamp v. Van Winkle & Co.*, 402 F.3d 1129, 1132 (11th Cir. 2005) (citing Advisory Committee Notes to Rule 4(m)). In *Horenkamp*,

rather than dismissing, the Eleventh Circuit affirmed a district court's order *deny-ing* a similar motion to dismiss and extending the deadline and cited the Advisory Rules explaining that a Court could do so when defendant "conceals a defect in attempted service," *even if good cause to do so was otherwise absent. Id.* at 1132–33. Defendants' challenge to service not only departs from the Department's ordinary practice, it contradicts Gwinnett officers' statements to the process servers as well as Corporal Broccoli's resounding silence when he accepted service. If Corporal Broccoli in fact lacked authority (which is not at all evident from the current record), he "conceal[ed]" that "defect in attempted service," particularly after other Gwinnett officers had specifically referred the process servers to him. *Id.*; [*see also* Ex. 1 ¶¶ 4, 8–11, 13, 15; Ex. 2 ¶¶ 5, 7–12]. That doesn't warrant dismissal.

*Second*, under *Horenkamp*, the Court can extend the service deadline to avoid a statute of limitations bar. Defendants' express aim for their service defense is to try to avoid liability via the statute of limitations. [*See* Dkt. 89 at 4–5 (seeking dismissal on statute of limitations grounds because "Defendants have not been properly served")]. But in *Horenkamp*, the Eleventh Circuit joined other circuits and the Advisory Committee who agree that is not what Rule 12(b)(5) is for. It held that the district court had correctly used its discretion to deny the motion and instead extend the service deadline because "if it were to dismiss her complaint, even without prejudice, her claim would be foreclosed because of the applicable statute

of limitations." 402 F.3d at 1133. Indeed, the Advisory Committee Notes specifically identify the situation where "the applicable statute of limitations would bar the refiled action" as one in which the district court could extend the service deadline "even in the absence of a showing of good cause." *Id.* at 1132.

Third, and finally, there remains good cause to extend, which is all that Rule 4(m) requires. Mr. Fields previously argued that there was "good cause" to extend [Dkt. 65], and this Court agreed. [Dkt. 67]. Nothing has changed that conclusion. The only practical difference between then and now is that Mr. Fields effected service in the ordinary course for these Defendants. And that was only after counsel for Mr. Fields asked if Defendants would waive service to try to minimize the burden on *both* parties, to which Defendants did not agree. *See* Fed. R. Civ. P. 4(d)(1) (a party subject to service "has a duty to avoid unnecessary expenses of serving the summons"); c*f. also* Fed. R. Civ. P. 1 (rules should be construed to secure the "just, speedy, and inexpensive determination of every action and proceeding").

These Defendant officers are undoubtedly on notice; they are undoubtedly subject to personal jurisdiction in the Northern District; and they are defended by the county and its chosen attorneys, as is typical. As such, beyond failing to satisfy Defendants' evidentiary burden, their Motion cuts against the Rules' purpose—*i.e.*, to provide suitable notice and expedite proceedings, *see id.*—and the clear thrust of this Court's prior orders that this case be decided on the merits. Thus, if

the Court has any lingering doubt that service wasn't perfected, it should once more extend the time to do so under Rule 4(m).

## II.  The Court Should Deny the Rule 12(b)(6) Motion for Failure to State a Claim

### A.  *Heck* Does Not Apply (*Counts V and VI*)

Defendants argue first that Mr. Fields's claims in Counts V (False Arrest) and VI (Excessive Force) are barred by *Heck v. Humphrey*. Under *Heck*, the court must dismiss the complaint if success on the claims would "necessarily imply the prisoner's state conviction was invalid." *Sconiers v. Lockhart*, 946 F.3d 1256, 1268 (11th Cir. 2020). "But when the facts required for a prisoner to prove his § 1983 case do not necessarily logically contradict the essential facts underlying the prisoner's conviction, *Heck* does not bar the § 1983 action from proceeding." *Id.* (citing *Dyer v. Lee*, 488 F.3d 876, 879 (11th Cir. 2007)).

#### 1.  Mr. Fields is not in Custody for the Same Conviction

For starters, it remains an open question in the Eleventh Circuit whether *Heck* applies *at all* when an individual is no longer incarcerated for the offense at issue. *See, e.g., El v. Lee,* No. 5:19-CV-74 (MTT), 2021 WL 359736, at *3 (M.D. Ga. Feb. 2, 2021) (discussing the Eleventh Circuit's treatment of Justice Souter's concurrence in *Spencer v. Kemna*, 523 U.S. 1, 21 (1998)). Other circuits have determined that *Heck* doesn't apply. *Id.* (citing *Huang v. Johnson*, 251 F.3d 65, 75 (2d Cir. 2001); *Nonnette v. Small*, 316 F.3d 872, 874 (9th Cir. 2002)). Mr. Fields alleged that he is

currently in jail on unrelated charges. [Dkt. 75 ¶ 3]. As such, the question is whether Mr. Fields "had the opportunity to challenge their underlying convictions but failed to do so." *El*, 2021 WL 359736, at *3. At this stage, taking Mr. Fields's allegations as true, this Court cannot make that determination as a matter of law.

### 2. Defendants' Liability for False Arrest Does Not "Necessarily Logically Contradict" the Facts of Mr. Fields's Convictions

When this Court originally dismissed the False Arrest claim under *Heck*, it explained that it did so because Mr. Fields was convicted of "willful obstruction," "which is the arrest about which he complains." [Dkt. 5 at 5]. But the record now shows that Mr. Fields was not convicted *of solicitation*, the purported crime for which Defendants arrested him. [*See* Dkt. 89-2]. The solicitation charge was apparently dismissed — it doesn't even appear in the accusation attached by Defendants. [*See* Dkt. 80-1]. That difference precludes a determination that the new claim for False Arrest (Count V) "necessarily logically contradict[s]" his convictions. To be sure, an arrest for obstruction includes as an element the officers' lawfulness. But that possible affirmative defense does not amount to a *Heck* bar because it does not make the two rulings "logically contradictory." *Dyer,* 488 F.3d at 883.

### 3. Defendants' Liability for Excessive Force Does Not "Necessarily Logically Contradict" the Facts of Mr. Fields's Convictions

As for the Excessive Force claim (Count VI), this Court should reaffirm its prior ruling that *Heck* does not apply. [*See* Dkt. 5 at 6 (citing *Sconiers*, 946 F.3d at

11

1269; *Hadley v. Gutierrez*, 526 F.3d 1324, 1327 (11th Cir. 2008))]. That is because De-

fendants' liability for Excessive Force does not "necessarily imply the invalidity"

of Mr. Fields's criminal convictions.

In *Hadley*—one of the cases this Court previously cited—the Eleventh Cir-

cuit acknowledged that plaintiff Hadley's conviction meant that he had resisted

arrest at some point, but noted that there was a possibility that he had been

"punched [by the defendant officer] then resisted, or even that he resisted first, but

was punched after he stopped resisting." 526 F.3d at 1331. The court concluded

that, under that possible set of facts, *Heck* did not apply. And in *Sconiers*, the Elev-

enth Circuit reaffirmed *Hadley*, noting that it straightforwardly applies the princi-

ple that a § 1983 claim must "necessarily logically contradict" the conviction to

trigger *Heck*. 946 F.3d at 1268 (citing *Dyer*, 488 F.3d at 881).

Here, the video demonstrates that, at the very least, Mr. Fields was tased

*before* he resisted arrest. That falls squarely within *Hadley* and *Sconiers*. Further, as

explained below in the discussion of qualified immunity, fact questions remain

about the scope and degree of Mr. Fields's resistance to arrest. Thus, it remains

possible that a jury could find that, though he was validly arrested for obstruction,[5]

---

[5] Mr. Fields's alternative claim for Excessive Force assumes that the arrest was
lawful. That is because, if the arrest was unlawful, the force used was necessarily
excessive and therefore "is subsumed in the illegal stop or arrest claim." *Lee v. Fer-
raro*, 284 F.3d 1188, 1193 (11th Cir. 2002).

nevertheless the officers used excessive force in other parts of the encounter. Applying *Hadley* and *Sconiers*, that possibility precludes *Heck* from barring the action.

Defendants ignore that binding law in favor of a district court case, *Hensley v. Langford*, No. 4:19-CV-267-TWT, 2022 WL 3718506 (N.D. Ga. Aug. 29, 2022). *Hensley* involves different facts than those here; but in any event, the court in *Hensley* discussed *Heck* only briefly and failed to consider *Sconiers* and *Hadley*. That case does not bind this court, and it does not mandate *Heck's* application here.

### B.  The Officers Are Not Entitled to Qualified Immunity

The Court is well-versed in the qualified immunity standard, and Mr. Fields does not dispute Defendants' presentation thereof or the Court's ability to rely on the bodycam video footage under *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300–1301 (11th Cir. 2024), with one exception: Defendants neglect to mention that the Court must construe the allegations (and the facts of the undisputed video footage) "in the light most favorable to the plaintiff." *Id.* at 1297.

With that in mind, Defendants mischaracterize what that footage shows—nowhere more so than when they recite the course of events out of order, as if to suggest that Mr. Fields was tased only *after* he purportedly kicked Officer Howse. [*See* Dkt. 89 at 13]. The video undisputedly shows the opposite. Indeed, the video confirms what Mr. Fields alleges: that Defendants arrested Mr. Fields without

justification or consideration for his rights, his safety, or his property. That violated clearly established law. Defendants are not entitled to qualified immunity.

### 1. Defendants Violated Clearly Established Law by Arresting Mr. Fields Without Arguable Probable Cause (*Count V*)

"An arrest made without arguable probable cause violates the Fourth Amendment's prohibition on unreasonable searches and seizures." *Skop v. City of Atlanta*, 485 F.3d 1130, 1143 (11th Cir. 2007)) (denying motion to dismiss). This was clear and true well before the Eleventh Circuit handed down *Skop* in 2007; it was true when Defendants arrested Mr. Fields in 2022; and it was true when another member of this Court relied on *Skop* in 2023. *See Radical v. City of Atlanta*, No. 1:19-CV-04530-VMC, 2023 WL 7225056, at *7 (N.D. Ga. Mar. 31, 2023). "To determine whether arguable probable cause exists, the court should ask whether reasonable officers in the same circumstances and possessing the same knowledge as [Defendants] could have believed that probable cause existed to arrest.'" *Id.* at *5 (citing *Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010)).

Defendants arrested Mr. Fields for solicitation under O.C.G.A. § 40-6-97 (b). That statute states, in pertinent part, that "no person shall stand on a highway for the purpose of soliciting employment, business, or contributions from the occupant of any vehicle." *Id.* Mr. Fields does not contest he was standing on a highway. But the video makes clear that Defendants lacked even arguable probable cause to

believe that either of the other two elements were met. Setting aside their plainly improper subjective intent, Defendants' actions were unreasonable.

Nothing about Mr. Fields's exchange with Defendants remotely suggests Mr. Fields solicited anyone. When first approached, Mr. Fields was standing alone. When initially asked what he was doing, Mr. Fields explained that he was "trying to get my stuff out of the woods." [*See* Defs' Ex. B-2 at 0:00:51[6]]. Defendants did not express any concern about solicitation to Mr. Fields but focused instead on Mr. Fields's small fire, made to keep himself warm. [*Id.* at 0:01:42].

Absent any real evidence to support their Motion, Defendants point to the existence of a squeegee, window cleaner, sign, and bottle of soap. Even assuming that property belonged to Mr. Fields—something Defendants later contest [*see* Dkt. 89 at 18]—the mere possession of those items does not amount to solicitation. Solicitation requires some additional action, such as "selling" or "asking for donations." *Robinson v. State*, 177 Ga. App. 848, 848 (1986) (citing *Zeiger v. State,* 140 Ga. App. 610 (1976)) (reversing conviction for individual who was passing out literature). Indeed, if mere possession were enough, every person holding a water bottle beside a road could be arrested for solicitation.

Defendants likewise had no evidence whatsoever that Mr. Fields was soliciting business "*from an occupant of a vehicle*" as the statute requires. Courts have

---

[66] Defendants filed their Exs. B-1 through B-3 on a thumb drive. [Dkt. 81].

strictly construed that requirement given that the statute's purpose is "to promul-

gate the safe and expeditious movement of vehicular traffic on the highways."

*Crook v. State*, 156 Ga. App. 756, 757 (1980). Simply put, "The solicitation of the

occupant of a vehicle on the highway is a conceded threat and impediment to the

movement of vehicular traffic; the solicitation of a pedestrian not within the flow

of the traffic is not." *Id.* But here, no vehicle traffic was impeded at any point.

Far from probable cause, the video reveals that this was an arrest in search

of a crime. Defendants had pre-determined they would haul Mr. Fields to jail, and

they spent nearly half an hour trying to decide what their theory was. To be sure,

Defendants' subjective beliefs are not dispositive.[7] But Defendants' delayed course

of action is *relevant*, *persuasive* evidence about the reasonableness of their conduct.

And Defendants' belated decision to settle on solicitation to support Mr. Fields'

arrest further undermines the idea that their decision was even objectively reason-

able. No matter what they argue now, there was nowhere near enough evidence

---

[7] The Eleventh Circuit has noted in general that the court "we do not consider an officer's subjective belief" when assessing qualified immunity. *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 738 (11th Cir. 2010). Yet it has also held in excessive force cases hold that whether an officer acted maliciously—*i.e.*, when knowingly lacking probable cause—can bear on the qualified immunity. *See, e.g., Johnson*, 107 F.4th at 1302 (citing *Baker v. City of Madison, Alabama*, 67 F.4th 1268, 1269 (11th Cir. 2023)). Here too, the maliciousness (and unreasonableness) of Defendants' conduct can be inferred based on their conduct without delving into subjective beliefs.

to support even arguable probable cause, much less probable cause to arrest. The Court should thus deny their Motion as to Count V (False Arrest).

**2. Defendants Violated Clearly Established Law by Using Excessive Force when Arresting Mr. Fields (*Count VI*)**

Even assuming that the arrest was valid,[8] the force used was nevertheless excessive under clearly established Eleventh Circuit law. To demonstrate that the law is clearly established, Mr. Fields is not bound to find a case with an exact factual match. It suffices when a "broader, clearly established principle should control the novel facts of the case." *Powell v. Snoo*k, 25 F.4th 912, 920 (11th Cir. 2022). And it has long been established that the Fourth Amendment "encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002).

The Eleventh Circuit has applied that principle to deny qualified immunity in published opinions involving remarkably similar cases. For example, the Eleventh Circuit has held that "that unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment." *Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011). Specifically, in *Fils*, the Eleventh Circuit denied qualified immunity to defendant who tased and forcibly placed a knee into the plaintiff's back when

---

[8] If the arrest was unlawful, the force used was necessarily excessive and therefore "is subsumed in the illegal stop or arrest claim." *Lee*, 284 F.3d at 1193.

arresting for disorderly conduct. *Id.* Elsewhere, the Eleventh Circuit has separately held that "tasing a person who is at an elevated height may come with a substantial risk of serious bodily harm or death" and is therefore excessive. *Bradley v. Benton*, 10 F.4th 1232, 1241 (11th Cir. 2021). Those and other cases establish the requisite precedent here.

Against that backdrop, Defendants plainly violated Mr. Fields' Fourth Amendment right. Indeed, Defendants hardly attempt to justify their use of force, and, as noted earlier, recite the facts out of order. [*See* Dkt. 80 at 10; Dkt. 89 at 13.] The Court need not accept their characterization. Instead, applying the guiding factors, the Court can see for itself that the Defendants' use of force was excessive and unreasonable under the "totality of the circumstances." *Johnson*, 107 F.4th at 1302 (citing factors from *Graham v. Connor*, 490 U.S. 386, 396 (1989) and *Baker v. City of Madison*, 67 F.4th 1268, 1269 (11th Cir. 2023)).[9] These seven factors are discussed in turn below.

***First***, the "the severity of the crime at issue" was virtually non-existent. *Id.* Defendants do not contest that point.

---

[9] The *Graham* factors are "[**1**] the severity of the crime at issue, [**2**] whether the suspect poses an immediate threat to the safety of the officers or others, and [**3**] whether he is actively resisting arrest or attempting to evade arrest for flight." *Johnson*, 107 F.4th at 1302 (brackets added). The additional *Baker* factors are "[**4**] the need for the application of force, [**5**] the relationship between the need and the amount of force used, [**6**] the extent of the injury inflicted, and [**7**] whether the force was applied in good faith or maliciously and sadistically." *Id.* (brackets added).

*Second*, and related, Mr. Fields did not "pose an immediate threat to the safety of the officers or others." *Id.* At all times, three officers with weapons surrounded him. Mr. Fields had stood calmly by, chatting with fire department employees and answering the Defendants' questions for nearly half an hour *before* they arrested him. When told he was (to his surprise) under arrest for "panhandling"—something he plainly hadn't done—he calmly asked the officers "can we talk about this?" [Defs' Ex. B-1 at 0:13:32–:55]. He pulled his hand back behind him and asked again to talk. At no point prior to being tased did he threaten the officers. He had no weapon. He never reached for any object resembling a weapon. And after being tased, once he came to a stop in the woods, he simply lay on the ground, telling Defendants he wasn't capable of standing up.

Defendants' only suggestion of any threat is that Mr. Fields subsequently kicked Defendant Howse. But that isn't captured on the video, raising at best a fact question about Mr. Fields's conduct. [*See, e.g.,* Defs' Ex. B-3 at 0:04:15–:22]. And in any event, any purported kick occurred at least three minutes after he was tased and well after the three officers pinned him on his stomach, wrenched his arms behind him, and put him in handcuffs. The "threat"—if it can be called that—was therefore constitutionally irrelevant. *See Glasscox v. City of Argo*, 903 F.3d 1207, 1215 (11th Cir. 2018), *abrogated on other grounds by Gilmore v. Georgia Dep't of Corr.*, 111

F.4th 1118 (11th Cir. 2024) ("Any resistance offered *after* the use of force is irrelevant to the reasonableness of the force employed." (emphasis added)).

*Third*, there is no indication that, Mr. Fields was "attempting to evade arrest for flight," *Johnson*, 107 F.4th at 1302, or as Defendants put it, "going to run into the woods." [Dkt. 89 at 13]. Prior to being tased, he repositioned himself from standing to leaning on the guardrail before being tased. Defendants say that after being tased, his "slid down the hill to distance himself," from the officers [*id.*], but it is not at all clear from the video that was intentional. Indeed, Defendants' taser policy explains that "The human body reacts to an ECW by involuntarily becoming rigid and straight" and that "The primary risk of serious injury or death during an ECW deployment is the risk related to falls." [Dkt. 75 ¶ 29 (citing Policy 507.03(C)(6)]. Notwithstanding that policy, Mr. Fields was tased immediately next to hill, and subsequently slid down it. At most, that evidence creates a fact issue about whether that sliding was purposely or an involuntary reaction to the taser — certainly not enough to sustain a motion to dismiss. And after he came to rest at the bottom of the hill, he stopped and did not move.

Likewise, Mr. Fields's "resistance" was minimal. *Johnson*, 107 F.4th at 1302. *Prior* to the Defendants' initial use of force, Mr. Fields was merely trying to engage the officers in conversation and get some information for their inexplicable decision to arrest him, information which they repeatedly declined to give. Most of the

conduct Defendants cite as resistance happened after Defendants used force on him and thus again is "irrelevant." *Glasscox*, 903 F. 3d at 1215. After he was tased, Mr. Fields was unable to stand and so simply lay in one place. When they told him to lay on his stomach, he hardly had time to react before Defendants forcefully grabbed him and flipped him over.

On that point, case law and Defendants' own policy manual both explain that a person who was just tased "might not be able to respond to commands during or immediately following exposure." [Dkt. 75 ¶ 31 (citing Policy 507.03 (D)(4)(b))]; *see also Glasscox*, 903 F.3d at 1215 ("a reasonable jury could conclude that Officer Moses's own actions [tasing the plaintiff] appear to have been preventing Mr. Glasscox from complying."). In other words, Defendants should have known that it would be difficult for Mr. Fields to comply and should have recognized his behavior as a reaction to being tased. Reasonable, well-trained officers would know not to escalate in those circumstances.

Defendants finally say that Fields "verbally confirmed" he was resisting [Dkt. 89 at 13], but yet again, that mischaracterizes the record. Instead, Mr. Fields repeatedly verbally indicated that he was not resisting before he was in handcuffs. [*See, e.g.,* Defs' Ex. B-3 at 0:02:15–:20]. He only spoke about not going to jail and made his other (obviously empty) statements after he was already in handcuffs.

*Fourth*, and relatedly, there was "no need" for the "amount of force used." *Johnson*, 107 F.4th at 1302. As explained above, Mr. Fields posed no threat whatso-ever. Yet at every juncture, rather than calmly respond to Mr. Fields's questions, the officers escalated the encounter. They did so by yelling, raising their weapons, firing a weapon after a cursory warning, repeatedly threatening to do so again, and then, before Mr. Fields even had a chance to roll onto his stomach, grabbing his arm, pinning it behind him, and forcing him into handcuffs.

*Fifth*, and (again) relatedly, "the amount of force used" far exceeded the "need" for that force. *Id.* That is evident from the fact that Defendant D'Allaird's use of the taser violated the policy manual (at least) three times over. The manual specifically states that "The ECW should never be used near flammable liquids and fumes," [Dkt. 75 ¶ 28 (citing Policy 507.03(C)(3))]; that an officer "should avoid deploying the ECW on persons . . . where a fall can be more injurious," [*id.* ¶ 29 (citing Policy 507.03(C)(6)]; and that the officer should "allow a reasonable amount of time for the subject to comply" with a warning, [*id.* ¶ 30 (citing Policy 507.03(D)(2)]. Yet D'Allaird tased Mr. Fields immediately next to the lighter fluid that the Defendants knew (and complained) about, immediately next to the drop off of the hill beside the highway, and a mere three seconds after the first warning. [*See, e.g.,* B-3 at 0:01:11–:14]. Those policies are not for nothing; as the Eleventh Circuit recently noted, "many [] courts that have recognized that tasing a person

22

who is at an elevated height may come with a substantial risk of serious bodily harm or death." *Bradley*, 10 F.4th at 1241 (individual died after being tased while standing atop a wall).

**Sixth**, though not indisputable evidence of Mr. Fields's injuries, the video evidence indicates that Mr. Fields was in severe pain and injured. *Johnson*, 107 F.4th at 1302. He told the officers that he was unable to stand, and he howled in pain as Defendants pressed on and pulled him. He was later taken to the hospital. Defendants do not contest this point either, nor could they, at least not without creating a fact issue.[10]

**Seventh**, the video demonstrates that the force was used "maliciously" and not "in good faith." *Id.* As noted before, well before he was arrested, the Defendants had pre-determined their intent to arrest Mr. Fields. Several minutes prior to arresting Mr. Fields, Defendant D'Allaird was told by another officer on the phone that "If we could take him to jail and get him out of there, that'd be good." [B-2 at 0:09:26–:29]. Thus, the evidence suggests and creates at least a fact issue that the arrest—and the subsequent force—were not exercised in good faith. (And as discussed further below regarding official immunity, this Court already found that Mr. Fields had plausibly alleged malice.)

---

[10] Mr. Fields's counsel has attempted to obtain Mr. Fields's medical records from the hospital but was told that he must obtain a subpoena. Thus, there remains a fact issue requiring discovery about the full extent of Mr. Fields's injuries.

Taken together, these factors point toward a straightforward violation of Mr. Fields's Fourth Amendment rights. Most of the factors point *strongly* in Mr. Fields's favor. Others depend on disputed facts not evident from the video. Particularly in light of the Eleventh Circuit's prior cases forbidding the use of excessive force in similar circumstances, nothing from Mr. Fields's Complaint or the video evidence warrants a grant of qualified immunity. The Court should therefore deny Defendants' Motion to Dismiss Count VI.

### 3. Defendants Violated Clearly Established Law by Failing to Secure Mr. Fields's Property Upon Arrest (*Count VII*)

Defendants incorrectly center their challenge to Mr. Fields's constitutional property claim as depending on his privacy interest. But "the Supreme Court rejected the notion that 'the Fourth Amendment protects against unreasonable seizures of property only when privacy or liberty is also implicated.'" *Hoefling v. City of Miami*, 811 F.3d 1271, 1281 (11th Cir. 2016) (citing *Soldal v. Cook County*, 506 U.S. 56, 60–61 (1992)).[11] At the time of Mr. Fields's arrest, it was clearly established that "the alleged removal and destruction of Mr. Hoefling's [property] . . . constitutes

---

[11] Though irrelevant here, Defendants' privacy argument also raises a particular concern for Mr. Fields as a homeless individual. Just because Mr. Fields did not have a house in which to store his property does not mean that he somehow cannot maintain a constitutionally-protected privacy interest in it. Defendants' privacy analysis would seem to erect an insurmountable barrier to homeless individuals' constitutional rights.

a seizure under the Fourth Amendment" and a plaintiff pleading as much can "sufficiently state[] a claim for an unconstitutional seizure." *Id.*

Further, Defendants improperly rely on disputed facts about ownership and the nature and location of the property; as such, their Motion exceeds *Johnson's* allowed use of the video evidence. Defendants argue that "there is no evidence" supporting his ownership of the property at issue [Dkt. 80 at 15], but at this stage, Mr. Fields is not required to adduce such evidence. *See Hoefling,* 811 F.3d at 1281 (reversing the district court's reliance on disputed evidence). Mr. Fields has rather properly alleged that (1) Defendants failed to properly collect and log his property; (2) Defendants failed to properly secure his property; (3) he had property totaling over $9,000, including a cell phone and a watch; and (4) a later investigation showed that Defendants had indeed failed to collect Mr. Fields's cell phone.

To be sure, these circumstances differ from *Hoefling,* where Miami police took the plaintiff's purportedly "derelict" sailboat and destroyed the boat and everything in it. 811 F. 3d at 1274–75. And the plaintiff there was not arrested. But Mr. Fields is not bound to find a case with an exact factual match to overcome qualified immunity. It suffices when "broader, clearly established principle should control the novel facts of the case." *Powell*, 25 F.4th at 920.

Here, by arresting Mr. Fields outside of any dwelling and then failing to account for his personal property at the scene, the officers necessarily seized his

property. And by failing to secure it, they necessarily abandoned or destroyed it. These allegations comfortably fall under the clear principles outlined by the court in *Hoefling*. And that suffices to state a claim. The Court should therefore deny Defendants' Motion to Dismiss Count VII.

### C.  The Officers Are Not Entitled to Official Immunity (*Count VIII*)

For starters, Defendants' challenge to Count VIII (state law Trespass to Property) suffers from the same flaw as its challenge to the constitutional property claim—*i.e.*, it improperly relies on disputed *facts* rather than allegations. Defendants argue that it is "certainly . . . unclear" that Mr. Fields owned the items he alleges belonged to him. [Dkt. 80 at 18]. That is irrelevant for a Motion to Dismiss.

Beyond that, Defendants seek dismissal based on state law official immunity. This Court already denied a similar challenge on the grounds that Mr. Fields sufficiently alleged that "Defendants arrested him on totally false charges." [Dkt. 23 at 5 (citing *Croland v. City of Atlanta*, 782 F. App'x 753, 760 (11th Cir. 2019) (stating that an officer is not entitled to summary judgment on official immunity grounds "where sufficient evidence exists that—at the time of an arrest—the officer had actual subjective knowledge that no crime was committed")].

Nothing has changed. As before, Mr. Fields has plausibly alleged that the arresting officers determined in advance that they wanted to arrest Mr. Fields and that they did so without even arguable probable cause that he had committed a

crime. Far from contradicting those allegations, the video evidence supports the plausibility of Defendants' subjective knowledge they were arresting Mr. Fields despite no crime having been committed.

Accordingly, Defendants are not entitled at this stage to official immunity for their conduct at the time of the arrest, including their conduct in seizing and abandoning or destroying Mr. Fields's property. The Court should deny their Motion to Dismiss the state law trespass claim in Count VIII.

## CONCLUSION

For the reasons explained above, the Motions to Dismiss of Defendants Howse [Dkt. 80] and D'Allaird & K. Lewis [Dkt. 89] should be dismissed in full. If the Court determines that service remains to be perfected, it should still deny the Motion, extend the time for service under Rule 4(m).

*[Signatures appear on the following page.]*

## **Signature of Counsel**

Respectfully submitted, this 22nd day of October, 2024.

*/s/ E. Allen Page*
Amanda Kay Seals
Georgia Bar No. 502720
E. Allen Page
Georgia Bar No. 640163
BONDURANT, MIXSON
  & ELMORE, LLP
1201 West Peachtree Street, NW
Suite 3900
Atlanta, GA 30309
Tel: 404-881-4100
seals@bmelaw.com
page@bmelaw.com

*Attorneys for Plaintiff*

## **Certificate of Compliance**

Pursuant to Local Rule 7.1(D), I certify that this submission complies with the page and word requirements in Local Rule 5.1 because it does not exceed 25 pages and is prepared with size 13 Book Antiqua font.


<u>/s/ E. Allen Page</u>
E. Allen Page

### <u>Certificate of Service</u>

I certify that on October 22, 2024, I submitted the foregoing via the Court's

CM/ECF system, which will serve an electronic copy on all attorneys of record.

_/s/ E. Allen Page_
E. Allen Page